Approved: ![signature]

MICHAEL D. MAIMIN
Assistant United States Attorney

Before: THE HONORABLE JUDITH C. McCARTHY
United States Magistrate Judge
Southern District of New York

- - - - - - - - - - - - - - - - x

| | |
|---|---|
| UNITED STATES OF AMERICA | : 14 Mag. 2642 |
| -v.- | : **SEALED COMPLAINT** |
| SALVATORE CARPANZANO, a/k/a "Salvino Casiraghi," | : Violation of 18 U.S.C. §§ 1343 and 2 |
| Defendant. | : COUNTY OF OFFENSE: WESTCHESTER |

- - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

MARYANN W. GOLDMAN, being duly sworn, deposes and says that she is a Special Agent with the Federal Bureau of Investigation (the "FBI"), and charges as follows:

## COUNT ONE
(The EB-5 Regional Center Fraud)

1. From at least in or about October 2012, up to and including at least in or about September 2013, in the Southern District of New York and elsewhere, SALVATORE CARPANZANO, a/k/a "Salvino Casiraghi," the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate or foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme or artifice, to wit, CARPANZANO, solicited approximately $2.7 million from a victim ("Victim-1"), through the use of interstate telephone calls, interstate emails, and wire transfers, including phone calls between Arizona and New Jersey and New York, based on false and fraudulent representations that he would deposit the money into an escrow account and act as an escrow agent when, in fact,

CARPANZANO used the money substantially for his own personal benefit.

(Title 18, United States Code, Sections 1343 and 2).

## COUNT TWO
(The Minerals Company Fraud)

2. From at least in or about January 2014, up to and including at least in or about April 2014, in the Southern District of New York and elsewhere, SALVATORE CARPANZANO, a/k/a "Salvino Casiraghi," the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate or foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme or artifice, to wit, CARPANZANO, solicited approximately $100,000 from a victim ("Victim-2"), through the use of interstate calls, interstate emails, and wire transfers, including the transfer of funds from an account in China into a bank account in Yonkers, New York, based on false and fraudulent representations that he would deposit the money into an escrow account and upon receipt, issue a loan to Victim-2, when, in fact, CARPANZANO used the money substantially for his own personal benefit and never issued the loan as promised.

(Title 18, United States Code, Sections 1343 and 2).

## COUNT THREE
(The "Mob Street" Fraud)

3. In or about 2011, in the Southern District of New York and elsewhere, SALVATORE CARPANZANO, a/k/a "Salvino Casiraghi," the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate or foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme or artifice, to wit, CARPANZANO, solicited approximately $1,825,000 from a victim ("Victim-4"), through the use of interstate calls, interstate emails, and wire transfers, including the transfer of funds from a bank account in New York into bank accounts in New York and New Jersey based on false and

2

fraudulent representations that he would deposit the money into an escrow account and upon receipt, provide $200 million in financing to a movie in which Victim-4 was an investor, when, in fact, CARPANZANO used the money substantially for his own personal benefit and never issued the loan as promised.

(Title 18, United States Code, Sections 1343 and 2).

The bases for my knowledge and the foregoing charges are, in part, as follows:

4. I am a Special Agent with the FBI, and I have been personally involved in the investigation of this matter. This affidavit is based in part upon my conversations with other law-enforcement agents, witnesses, and victims, and my examination of reports and records, including but not limited to documents and information provided to me by victims, a review of bank records and public records, and information provided to me by witnesses who participated in conversations and written communications with SALVATORE CARPANZANO, a/k/a "Salvino Casiraghi," the defendant. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## GENERAL BACKGROUND

5. Based upon interviews of witnesses, a review of documents provided by witnesses, and a review of public records, and surveillance, I have learned the following:

    a. In or about June 2012, Samba Financial Group Escrow & Consulting Services, USA LLC ("SFGECS") was incorporated as a domestic limited liability company in New Jersey, with a main business address in Valhalla, New York (the "Valhalla Address."

    b. Samba Financial Group is a Saudi Arabian bank. According to the Federal Deposit Insurance Corporation (the "FDIC"), the deposits of the Samba Financial Group are not insured by the FDIC. Moreover, I have reviewed the website for Samba Financial Group, which indicates that Samba Financial Group has branches outside of Saudi Arabia in the United Kingdom, Dubai, Pakistan, and Qatar; it does not indicate that Samba Financial Group has a branch in the United States.

3

c. SALVATORE CARPANZANO, a/k/a "Salvino Casiraghi," the defendant, claims to be a Principal in, and the Director of U.S. Operations for, SFGECS.

d. CARPANZANO has represented that SFGECS is affiliated with Samba Financial Group.

e. In 2011 and 2012, CARPANZANO indicated to a bank that a house on Taunton Road East in Scarsdale, New York (the "Taunton Road East Residence") was his residence.

f. In or about 2013 and 2014, CARPANZANO resided in a house on Butler Road in Scarsdale, New York (the "Butler Road Residence").

g. According to a title search, the deed for a house in Atlantic Highlands, New Jersey (the "Atlantic Highlands House") was transferred to CARPANZANO's wife in 2004; beginning in 2006, CARPANZANO and his wife jointly obtained mortgages on the Atlantic Highlands House.

h. According to both database searches and loan documents submitted and/or executed by CARPANZANO, from at least in or about 2011 up through in or about 2014, CARPANZANO has listed one or more properties as his residence, all in New York and New Jersey.

i. According to a check of databases maintained by the Financial Crimes Enforcement Network ("FinCEN"), neither CARPANZANO nor his wife hold licenses to operate a financial business.

### EB-5 REGIONAL CENTER FRAUD

6. Based upon interviews of witnesses, a review of documents provided by witnesses, and a review of public records, I have learned the following:

a. The "EB-5" or Immigrant Investor Program, administered by the United States Citizenship and Immigration Services ("U.S.C.I.S."), is a program that provides foreign investors with an opportunity to obtain visas. Specifically, pursuant to the program, regional centers approved by U.S.C.I.S. identify investment opportunities in particular geographic regions of the United States, such as construction and development projects, in which foreign investors can invest in exchange for the investors' receiving visas. To be eligible for a visa, a foreign investor must make a capital contribution of

4

at least $500,000 in an approved project, in addition to a $40,000 to $45,000 administrative fee. Generally, the investors' contributions are held in an escrow account, and, twenty-one months after the initial investment, the investor may apply for a visa for himself, his spouse, and any child under the age of 21.

    b. Victim-1 is a U.S.C.I.S.-approved regional center located in Arizona specializing in offering EB-5 compliant capital investment opportunities for foreign investors seeking visas.

## The Scheme to Defraud

   7. Based upon interviews of witnesses, a review of documents provided to me by witnesses, and my review of documents provided by banks and others, I have learned that, from in or about at least December 2012 through in or about at least September 2013, SALVATORE CARPANZANO, a/k/a "Salvino Casiraghi," the defendant, who claimed to be the Director of US Operations for SFGECS, represented to Victim-1, in substance and in part, that SFGECS was a legitimate escrow agent. Based on this representation, Victim-1 wired $2.7 million, consisting of the capital contributions and administrative fees of five foreign investors, to a bank account in Scarsdale, New York. CARPANZANO used substantially all of the $2.7 million for his own personal use, including for cash withdrawals, wire transfers, and to pay personal expenses.

   8. Based upon my conversations with two partners of Victim-1 (the "Partners"), as well as my review of documents provided to me by the Partners, I have learned the following:

    a. In or about 2011, Victim-1 was involved in a development project to construct an assisted living complex in Arizona (the "Project"). The Project was being developed by a developer (the "Developer"). Victim-1 identified five foreign investors from Mexico (the "Investors") to fund the project, and in or about July 2011, Victim-1 entered into an EB-5 Escrow agreement (the "Original Escrow Agreement") with a bank (the "Bank"). Pursuant to the Original Escrow Agreement, Victim-1 placed $2.7 million, representing the Investors' initial investments and administrative fees, in an escrow account with the Bank (the "Original Escrow Account").

    b. In or about late 2012, the Bank advised Victim-1, in substance and in part, that Victim-1 needed to move its $2.7 million from the Original Escrow Account to a new account with a

5

different financial institution because the Bank was getting out of the EB-5 escrow business.

    c. Through a financing broker (the "Broker") the Partners were introduced to SALVATORE CARPANZANO, a/k/a "Salvino Casiraghi," the defendant. In or about November and December 2012, the Partners, in Arizona, spoke with CARPANZANO and one of his associates, a purported director of SFGECS ("CC-1"), by phone and by Skype numerous times. During the phone calls, CARPANZANO explained that he was in either New York or New Jersey. During the phone calls, CARPANZANO told the Partners, in substance and in part, that SFGECS was affiliated with the Samba Financial Group in the United Arab Emirates, and that, in addition to escrowing funds, SFGECS could also lend Victim-1 investment capital for the Project.

    d. On or about December 6, 2012, Victim-1 and SFGECS executed an escrow agreement (the "Samba Escrow Agreement"). CC-1 signed the escrow agreement on behalf of SFGECS. On or about December 7, 2012, CARPANZANO, using a New Jersey phone number, called and spoke with the Partners in Arizona about how to deposit money pursuant to the Samba Escrow Agreement. On or about December 10, 2012, pursuant to the Samba Escrow Agreement, and in accordance with the December 7, 2012 discussion, the Bank, on behalf of Victim-1, wired $2.7 million from an account in New York, New York into a Citibank account in Scarsdale, New York (the "Citibank SFGECS Account").

    e. In or about early 2013, the Partners requested an account statement from CARPANZANO verifying that Victim-1's $2.7 million was still in the Citibank SFGECS Account. On or about March 5, 2013, CARPANZANO sent Victim-1, by e-mail, what purported to be a .pdf of a "checking summary" with a clerk's date-stamp of March 5, 2013, as well as a document purporting to be from "Samba Financial Group U.S.A.," signed by CARPANZANO on behalf of SFGECS, dated March 1, 2013, but with a date-stamp of October 4, 2012 (jointly, the "False Account Statement"). The "checking summary" of the False Account Statement purported to show summaries of available funds in four Citibank accounts: $2.7 million in the Citibank SFGECS Account,[1] and $2 million, $1.5 million, and $22 million in the other three accounts. On or about March 10, 2013, the Partners e-mailed CARPANZANO at "scarpanzano@sambafinancialgroupusa.com" and asked why the False Account Statement had a date stamp of October 4, 2012, and

---

[1] As discussed below, on March 5, 2013, there was actually just over $1.4 million in the Citibank SFGECS Account.

6

whether "there is a Citibank cover letter that can be part of the statement. It does not look very official as shown." CARPANZANO replied, by e-mail, the same day, explaining:

> The stamp is the registration stamp of Samba in NY..U.S.A. [sic] The date has nothing to do with anything pertaining to the date of the letter.
>
> The letter can not be supplied by Citibank because the money is held in the Samba Escrow account not in any Citibank escrow. I am sure I can get a letter saying that the statement is a proper statement, but they will not attest to anything other than the amount in the account. Is that what they are asking for? Also these funds at this time are pledge for [the Developer's] transaction that will close this week for sure. So please be more specific in what you need. [The Developer] will have his wire no later than Wednesday."

f. In or about early April 2013, one of the Partners called Citibank to ask how much money was in the Citibank Account, and indicated that there should be $2.7 million in the Citibank SFGECS Account. A representative from Citibank stated, in substance and in part, that Citibank could not disclose how much money was in the Citibank SFGECS Account to the Partners—who were not signatories on the Citibank SFGECS Account—but, after hearing that there should be $2.7 million in the Citibank SFGECS Account, indicated that the amount was closer to $26,000.

g. On or about April 26, 2013, the Partners e-mailed CARPANZANO to explain that the Partners planned to move their escrow accounts, and indicating that the Partners will provide wiring instructions to move the escrowed funds, also indicating that CARPANZANO will have to wire one of the Investors back that Investor's funds. That day, CARPANZANO replied, by e-mail:

David:

1) You have been dismissed by [the Developer].

2) You are being notified by this email to, Cease and Desist from contacting Citibank and/or Samba Financial Group USA.

7

> 3 You have no authority to have any funds returned or moved.
>
> 4 There will be no funds sent anywhere under your direction.
>
> S.C.

    h.  In or about May or June 2013, one of the Investors requested that the Investor's investment be returned. Pursuant to the terms of the Samba Escrow Agreement, on or about June 5, 2013, the Partners sent an e-mail to CARPANZANO instructing him to return $540,000 to the Investor. CARPANZANO never responded.  The Investor's money was never returned.

    i.  Neither of the Partners, nor any of the Investors, authorized any transfers or distributions from the Citibank SFGECS Account.

    j.  On or about August 19, 2013, Victim-1, through its attorney, sent a notice of termination of escrow (the "Notice of Termination") to SFGECS at the Valhalla Address and by e-mail to scarpanzano@sambafinancialgroup.com, demanding the return of $2.7 million.  The mailed notice of termination was returned as undeliverable.  On August 20, 2013, CARPANZANO e-mailed Victim-1's attorney, stating:

> I have no idea what you are talking about. The funds that are in the escrow are from [the Developer] for a loan as stated in [the Developer's] escrow agreement contract.
>
> I am in Istanbul Turkey, when I return I will email you and you may contact me.

    9.  I have reviewed a copy of the Samba Escrow Agreement. Based on my review of the agreement, I have learned the following:

    a.  Pursuant to the Samba Escrow Agreement, SFGECS was appointed as escrow agent for Victim-1.

    b.  As the escrow agent, SFGECS was required to establish three separate accounts: the Main Escrow Account; the Capital Contribution Account; and the Administrative Fee Account.  SFGECS was required to give online access to the accounts so that Victim-1 could view online any deposits, withdrawals, and balances in such accounts.

8

c. Regarding the transfer and distribution of funds, the Samba Escrow Agreement provides that SFGECS is authorized to release funds from the Capital Contribution and Administrative Fee Accounts only when certain conditions have been met and only upon written notification from either Victim-1 or the Investors.

10. I have reviewed records of Citibank pertaining to the Citibank SFGECS Account. Based on my review of those records, I have learned the following:

    a. The wife (the "Wife") of SALVATORE CARPANZANO, a/k/a "Salvino Casiraghi," the defendant, opened the Citibank Account on or about August 10, 2012. The name of the business listed on the account application is "Samba Financial Group Escrow & Consulting Services U.S.A. LLC," and the address provided is the Taunton Road East Residence.

    b. On or about December 10, 2012, there was a balance of approximately $45,894.32 in the Citibank SFGECS Account.

    c. On or about December 10, 2012, the Bank, on behalf of Victim-1, wired a total of $2.7 million into the Citibank SFGECS Account.

    d. From on or about December 10, 2012 until on or about September 30, 2013, approximately $3,265,696 in additional funds was added to the Citibank SFGECS Account.[2]

    e. On or about March 5, 2013, the balance in the Citibank SFGECS Account ranged from $1,418,847.29 to $1,427,736.83.

---

[2] For example, on or about December 11, 2012, another individual ("Victim-3), through his attorney, wired $2,000,000 into the Citibank SFGECS Account. I have spoken with Victim-3 and learned that Victim-3 spoke with SALVATORE CARPANZANO, a/k/a "Salvino Casiraghi," the defendant, who agreed to arrange for a $1.1 billion letter of credit for a business venture of Victim-3, but CARPANZANO told Victim-3 that Victim-3 had to place $2,000,000 in escrow with SFGECS in order to facilitate that transaction. Victim-3 explained that Victim-3 received neither the letter of credit nor a return of the $2,000,000 escrow, despite demanding a return of that escrow.

f. The Citibank SFGECS Account was closed on or about September 30, 2013. As of September 30, 2013, the account balance was $0.

g. From on or about December 10, 2012 through on or about September 30, 2013, there were numerous transfers to other accounts associated with CARPANZANO, as well as numerous transactions for personal expenses and cash withdrawals, for a total of $6,011,589.93 in disbursements. For example:

i. From on or about March 18, 2013 through on or about June 25, 2013, approximately $1.2 million was transferred from the Citibank SFGECS Account to a bank account in the name of Global Discount Electronic Wholesalers. According to records of the State of New Jersey, Department of Treasury, Division of Revenue and Enterprise Services (the "NJDOT"), "Salvatore Carpanzano" is the Principal of, among other businesses, Global Discount Electronics Wholesalers LLC.

ii. From or about December 19, 2012 through on or about August 1, 2013, approximately $758,000 was transferred from the Citibank SFGECS Account to a bank account in the name JAC Financial Services (the "JAC Account"). According to Citibank records pertaining to the JAC Account, the Wife opened the JAC Account on August 10, 2012, providing the Taunton Road East Residence as the address.

iii. From on or about January 3, 2013 through on or about March 5, 2013, approximately $533,945 was transferred from the Citibank SFGECS Account to Ferrari-Maserati.

iv. From on or about December 10, 2012 through on or about August 27, 2013, approximately $129,907 in cash and ATM withdrawals was withdrawn from the Citibank SFGECS Account.

v. From on or about December 17, 2012, through on or about January 29, 2013, approximately $955,000 was wired from the Citibank SFGECS Account to a co-conspirator ("CC-2") in Turkey.

11. According to records of the NJDOT, "Salvatore Carpanzano" is the Principal of, among other businesses, Samba Financial Group Escrow & Consulting Service U.S.A. LLC, Global Discount Electronics Wholesalers LLC, and JAC Financial Services Limited Liability Company.

## THE MINERALS COMPANY FRAUD

12. Based upon interviews of witnesses, a review of documents provided to me by witnesses, and my review of documents provided by banks and others, I have learned that, from in or about January 2014 through in or about April 2014, SALVATORE CARPANZANO, a/k/a "Salvino Casiraghi, the defendant, who claimed to be the Director of US operations for SFGECS, represented to Victim-2, in substance and in part, that SFGECS was a legitimate financing company that offered private loans and leases of financial instruments. Based on this representation, Victim-2 wired $100,000, which was to be held in an escrow account, to a bank account in Yonkers, New York, controlled by CARPANZANO to secure the lease of a $5 million financial instrument. CARPANZANO used substantially all of the $100,000 for his own personal use, including for cash withdrawals, wire transfers, and to pay personal expenses, and he never provided the $5 million financial instrument as promised. Moreover, CARPANZANO attempted to solicit an additional $250,000 from Victim-2 purportedly to complete the transaction.

13. Based upon my conversations with Victim-2, as well as my review of documents provided to me by Victim-2, I have learned the following:

   a. Victim-2 owns a business based in China, which specializes in exporting and importing copper, gold, textiles, and other materials between China and Brazil (the "Minerals Company").

   b. In or about January 2014, Victim-2, working with a partner, sought credit for the Minerals Company. A consultant based in Barcelona, Spain (the "Consultant") introduced Victim-2 to SALVATORE CARPANZANO, a/k/a "Salvino Casiraghi," the defendant.

   c. In or about early February 2014, Victim-2, who was then in China, participated in a conference call, via Skype, with CARPANZANO. During the call, CARPANZANO told Victim-2, in substance and in part, that his company, SFGECS, had a joint venture with Samba Financial Group in Saudi Arabia and that the company could offer private loans and/or lease financial instruments. CARPANZANO told Victim-2 that the cost to lease a financial instrument was 11% of the face value of the instrument, and he discussed two different instruments with Victim-2: one for $5 million and one for $8 million. CARPANZANO further advised Victim-2 that, to secure the $5 million

11

instrument, Victim-2 would have to provide 2% or $100,000, which would be held in an escrow account. Once CARPANZANO confirmed receipt of the $100,000 in the escrow account, he would then wire the $5 million to an account designated by the Minerals Company.

       d. Victim-2 agreed to provide the $100,000 and, on or about February 16, 2014, Victim-2, on behalf of the Minerals Company, entered into an escrow agreement with SFGECS (the "Minerals Company Escrow Agreement"). CC-1, purporting to be the Chief Financial Officer of SFGECS, executed the Minerals Company Escrow Agreement on behalf of SFGECS.

       e. After Victim-2 signed the Minerals Company Escrow Agreement, but before Victim-2 wired any escrow money to SFGECS, CARPANZANO advised Victim-2 that the fee for leasing the $5 million financial instrument was 13%, not 11%. Victim-2 agreed to the increased fee, and on or about February 24, 2014, the Minerals Company wired approximately $100,000 from an account in China to a Hudson Valley Bank account in Yonkers, New York (the "Hudson Valley Bank Account").

       f. For approximately three days after wiring the escrow money, Victim-2 tried to confirm CARPANZANO's receipt of the funds. CARPANZANO did not return any of Victim-2's phone calls.

       g. In or about March 2014, after the intervention of a third party, CARPANZANO asked Victim-2 to confirm the account information and coordinates for the account into which SFGECS was to wire the $5 million, as well as a notarized letter confirming the need for a transfer. Victim-2, through the Consultant, e-mailed that information to CARPANZANO at scarpanzano@sambafinancialgroup.com.

       h. On or about March 12, 2014, Victim-2 sent a notarized "cancellation letter" to "Samba Financial Group" at the Butler Road Address. The letter was signed for and received at the Butler Road Address.

       i. Shortly thereafter, CARPANZANO advised Victim-2 that he had attempted to send the $5 million instrument to Victim-2, but the account information and coordinates provided by Victim-2 were wrong and the $5 million instrument had bounced back.

       j. CARPANZANO told Victim-2, in substance and in part, that, because the Minerals Company had provided inaccurate

12

banking information—in direct default of the Minerals Company Escrow Agreement—Victim-2 needed to wire an additional $250,000 to secure the $5 million financial instrument. Victim-2 advised CARPANZANO that Victim-2 needed time to obtain approval to send the $250,000.

      k.    In early April 2014, Victim-2 was referred to me. After that time, at my direction, Victim-2 engaged in consensually recorded phone calls and a consensually recorded meeting with CARPANZANO. I have reviewed the recordings of those phone calls and that meeting. I learned the following from discussions with Victim-2, my review of the recordings, and my review of text messages between Victim-2 and CARPANZANO:

      i.    Victim-2 requested an in-person meeting with CARPANZANO to discuss completing the deal and securing the $5 million financial instrument. CARPANZANO agreed and, on April 8, 2014, Victim-2 met with CARPANZANO at a restaurant in White Plains, New York. At the meeting, Victim-2 and CARPANZANO discussed, among other things, Samba Financial Group, CARPANZANO's frequent international travel, and the money purportedly in escrow. CARPANZANO stated, in substance and in part, that the money was still all in escrow, that he could contact CC-1, and that he could get a statement to show Victim-2 that the money was still in escrow.

      ii.    Victim-2 and the Consultant spoke with CARPANZANO by telephone on April 16, 2014. Victim-2 spoke, in substance and in part, about waiting for a letter. CARPANZANO said, in substance and in part, that he had the letter from CC-1, asked about the Consultant convincing Victim-2's partner to send $250,000.

      iii.    On or about April 21, 2014, CC-1 emailed the Consultant and Victim-2, copying CARPANZANO. In the e-mail, CC-1 told Victim-2 that he would be "liquidating [the] escrow of $100,000 tomorrow to SFGECS US as forfeiture for non-performance and inaccurate banking information. … In the event you will be complying with the request made last week for the deposit of 50% of the fee, please be sure to contact me ASAP."

      iv.    Victim-2 and the Consultant spoke with CARPANZANO by telephone on April 22, 2014. The Consultant told CARPANZANO that the Consultant and Victim-2 sent the letter to CC-1, but received no proof of any funds being sent, and that Victim-2's bank said that there were no funds left in the Hudson Valley Bank Account. CARPANZANO stated, in substance and in part, that the response did not mean that the funds were not

13

there, and that the Consultant and Victim-2 had broken the law by checking. CARPANZANO said that it showed "your inability to do what you say you are going to do. So there's nothing I can do now. You gonna send in your 50%, I'll call them and tell them you said yes again, and see what they say. If you're not, then there's nothing for you to discuss with me, you have to discuss it with" CC-1. CARPANZANO continued to explain, in substance and in part, that CC-1 and CC-2 expressed concern about working with Victim-2, and it was CARPANZANO who agreed to "try [Victim-2] one more time." CARPANZANO said that Victim-2's "bank sent over improper [wire routing] coordinates to us, to them over there, not to me." CARPANZANO then said: "I'm going to give you the [CC-2] solution. The [CC-2] solution is: you can spend a whole bunch of money on an attorney who is going to get you nowhere, or you can do what I ask you to do, this is [CC-2] speaking, and you can do what I asked you to do and you can go on with life and everybody's happy."

1. Victim-2 never received the $5 million financial instrument or a refund of the $100,000 in escrow.

14. I have reviewed records of Hudson Valley Bank pertaining to the Hudson Valley Bank Account. Based on my review of those records, I have learned the following:

   a. The account was opened on September 9, 2013, by "Salvatore Carpanzano" in the name "Samba Fin Group US LLC." The address provided on the account application was the Butler Road Residence.

   b. The driver's license number and date of birth listed on the account application are the driver's license number and date of birth of SALVATORE CARPANZANO, the defendant.

   c. As of January 31, 2014, there was $28,325.98 in the account.

   d. On or about February 24, 2014, the Minerals Company wired $99,975 from an account in China into the account.

   e. On or about February 26, 2014, $66,400 was wired from the Hudson Valley Bank account into a bank account in the name of Wire One Communication Point in Dubai.

   f. From on or about February 24, 2014 through on or about March 31, 2014, there were numerous withdrawals from the account for personal expenses, like hotel bills, restaurant charges, and charges from retail stores.

g. As of March 31, 2014, the balance in the Hudson Valley Bank Account was $1,661.18.

## THE MOB STREET FRAUD

15. Based upon interviews of witnesses, a review of documents provided to me by witnesses, and my review of documents provided by banks and others, I have learned that, in or about 2011, SALVATORE CARPANZANO, a/k/a "Salvino Casiraghi, the defendant, who claimed to be a representative of a firm named Treasures FZE, represented to Victim-4, in substance and in part, that Treasures FZE would provide $200 million in financing for a movie tentatively titled "Mob Street," but that Victim-4 had to place $1.3 million in escrow to secure that financing. Based on this representation, Victim-4 wired $1,325,000 to a bank account maintained by Citibank in New York, controlled by CARPANZANO (the "Citibank ANTIM Account"). CARPANZANO transferred Victim-4's money to a bank account maintained by Provident Bank in New Jersey controlled by CARPANZANO (the "Provident Account"). CARPANZANO then represented to Victim-4 that Victim-4 needed to wire an additional $500,000 in closing costs in order to obtain the $200 million in financing. Based on this representation, Victim-4 wired $500,000 to the Provident Account. CARPANZANO never provided the $200 million in financing as promised.

16. Based upon my conversations with Victim-4, Victim-4's personal attorney (the "Attorney"), as well as my review of documents provided to me by Victim-4 and the Attorney, I have learned the following:

a. Victim-4 is the principal of a construction company. In or about 2009, Victim-4 was introduced to an individual who told Victim-4 that the individual was trying to produce a movie named "Mob Street," through a film production company (the "Film Company"). Victim-4 invested $50,000 in the Mob Street production through the Film Company. Victim-4 then invested an additional $250,000 in the Mob Street production through the Film Company in order to purchase the rights to the story of a well-known criminal.

b. In or about 2011, an associate with a law firm representing the Film Company (the "Associate") told Victim-4 that the Attorney also represented a firm called "Treasures FZE," which provided project financing.

c. Through the Associate, Victim-4, along with another representative of the Film Company and the general

15

counsel of the Film Company (the "General Counsel") met SALVATORE CARPANZANO, a/k/a "Salvino Casiraghi," the defendant, in New Jersey. The Associate explained that CARPANZANO was a representative of Treasures FZE. At the meeting, CARPANZANO called CC-2, who discussed various types of financing to which CC-2 claimed to have access. CARPANZANO stated that, in order to secure $200 million in financing from Treasures FZE, the Film Company or someone else would have to place $1.3 million in an escrow account with the American National Trust and Investment Management Company ("ANTIM").

        d. In or about July of 2011, CARPANZANO, Victim-4, and others agreed on a date to fly to Switzerland to close on $200 million in financing.

        e. On or about July 22, 2011, the Film Company, Treasures FZE, and ANTIM entered into an escrow agreement (the "Mob Street Escrow Agreement." I have reviewed the Mob Street Escrow Agreement, which states that Treasures FZE has agreed to cause its bank to issue a letter of credit to the Film Company, and that the Film Company "shall wire into the account designated by the Escrow Agent [ANTIM] the sum of $1,300,000.00 plus all escrow fees in USD. Total including Escrow Fees of $25,000.00, $1,325,000.00 USD (One Million Three Hundred Twenty Five Thousand United States Dollars)." The Mob Street Escrow Agreement also states that the Film Company and Treasures FZE "shall be meeting together in Zurich, Switzerland, at UBS Bank's head offices during the week of July 27, 2011, to consummate and close the transactions contemplated." CARPANZANO signed the Mob Street Escrow Agreement on behalf of Treasures FZE.

        f. On or about July 25, 2011, Victim-4 wired approximately $1,325,000 into what CARPANZANO represented was the ANTIM escrow account.

        g. Shortly after placing the money in what CARPANZANO represented was the ANTIM escrow account, CARPANZANO, Victim-4, the General Counsel, and another representative of the Film Company flew to Switzerland. While they were on the plane, the Attorney received a call from Victim-4's banker, in which the banker told the Attorney that someone was trying to wire the $1.3 million out of the ANTIM escrow account. The Attorney froze those funds.

        h. When Victim-4 landed in Switzerland, Victim-4 found that the Attorney had frozen the funds. Victim-4 asked CARPANZANO why the funds were being moved out of the ANTIM account in violation of the terms of the escrow agreement.

CARPANZANO stated, in substance and in part, that CC-2 was now insulted by the freezing of the funds, and that Treasures FZE attempted to remove the money in order to provide better financing terms. CARPANZANO and CC-2 spoke with Victim-4 and persuaded Victim-4 to authorize the release of the funds.

        i. In or about August 2011, CARPANZANO told Victim-4, in substance and in part, that CC-2 would consider closing the deal, but needed an additional $500,000 in closing costs. Victim-4 wired a total of $500,000 to another ANTIM account.

        j. In or about September 2011, CARPANZANO asked Victim-4 to wire an additional $1 million into CARPANZANO's wife's account to facilitate the delivery of the $200 million in financing. Victim-4 refused.

        k. In or about September 2011, CARPANZANO produced a document, purporting to be an "MT103" dated September 23, 2011, that purported to confirm that 200 million Euros was delivered to the Film Company. The MT103 purported that the banker involved in the transaction (the "Purported Banker") was a banker with Deutsche Bank. Victim-4's own banker confirmed that the Purported Banker was, in fact, an employee in Deutsche Bank's press department who had no client contact and did not engage in wire transfers. The General Counsel contacted an investigator with the Federal Reserve Bank of New York, who confirmed that the MT103 appeared to be fraudulent, and the language in the MT103 was consistent with common advance-fee scams.

        l. The General Counsel traveled to Istanbul, Turkey, to meet with CC-2 and attempt to negotiate the $200 million financing on behalf of the Film Company. CARPANZANO took the General Counsel to CC-2's office, where the General Counsel met with CARPANZANO and CC-2. CC-2 told the General Counsel that Victim-4's team was in error, and that the General Counsel would not get out of Turkey alive. The General Counsel left the office, but CARPANZANO remained behind with CC-2.

    17. I have reviewed records of Citibank pertaining to the Citibank ANTIM Account. Based on my review of those records, I have learned the following:

        a. The Citibank ANTIM Account is in the name of "Amer Nat'l Trust & Inv Mgmt Co LLC," with the Atlantic Highlands House as the address.

17

b. On or about July 25, 2011, $1,325,000 was wired into the Citibank ANTIM Account from Victim-4's bank account in Irvington, New York.

c. On or about July 25, 2011, $10,000 was wire-transferred from the Citibank ANTIM Account to another account.

d. On or about July 27, 2011, $10,000 was wired to another account, and the Citibank ANTIM Account was closed out, with the remaining $1,304,990 wired to the Provident Account.[3]

18. I have reviewed records of Provident Bank pertaining to the Provident Account. Based on my review of those records, I have learned the following:

a. The Provident Account is in the name of "American National Trust and Investment Company LLC," with the Atlantic Highlands House as the address. The branch at which the Provident Account is kept is in New Jersey.

b. On or about August 1, 2011, the Provident Account reflected the receipt of a $1,304,990 deposit.

c. On or about August 22, 2011, the Provident Account received two wire transfers totaling $440,000. On or about August 23, 2011, the Provident Account received a wire transfer of $60,000. According to records of the August 23, 2011, wire transfer, the wire transfer was sent from Victim-4's bank account in Irvington, New York, to the Provident Account.

d. During the month of August 2011, there were frequent withdrawals from, and wire transfers out of, the Provident Account, including wire transfers out of $495,000 on August 4, 2011, $425,000 on August 8, 2011, $110,000 on August 11, 2011, $280,000 on August 17, 2011, $69,503.95 on August 19, 2011, and a withdrawal of $50,000 on August 11, 2011, which $50,000 was deposited in an account at JPMorgan Chase in the name of ANTIM.

19. I have reviewed records from the United States Department of Homeland Security relating to international travel

---

[3] There were also other deposits and withdrawals, as well as certain fees, on July 27, 2011, including $6,300 deposited by, and wired to, CARPANZANO's mother, and $1.2 million deposited by, and wired to, CC-2.

18

by the General Counsel. Based on my review of those records, I have learned the following:

   a. On or about July 26, 2011, the General Counsel flew from New York to Zurich, returning on or about August 26, 2011.

   b. On or about October 2, 2011, the General Counsel flew from New York to Istanbul, Turkey, returning on or about October 6, 2011.

20. I have reviewed records from the FBI relating to international travel by SALVATORE CARPANZANO, a/k/a "Salvino Casiraghi," the defendant. Based on my review of those records, I have learned the following:

   a. On or about July 26, 2011, CARPANZANO flew from New York to Zurich, returning on or about August 12, 2011.

   b. On or about October 2, 2011, CARPANZANO flew from New York to Istanbul, Turkey, returning on or about October 12, 2011.

WHEREFORE, deponent respectfully requests that a warrant be issued for the arrest of SALVATORE CARPANZANO, a/k/a "Salvino Casiraghi, the defendant, and that he be arrested and imprisoned, or bailed, as the case may be.

_____
MARYANN W. GOLDMAN
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Sworn to before me this
21st day of November, 2014

_____
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

19